**Michael J. LICHOFF, et al., Plaintiffs,**

v.

**CSX TRANSPORTATION, INC., Defendant.**

No. 3:01 CV 7388.

United States District Court, N.D. Ohio, Western Division.

Oct. 28, 2003.

Andrew J. Thompson, Stege & Michelson, Gerald B. Chattman, Buckingham, Doolittle & Burroughs, Michael B. Michelson, Stege & Michelson, Morris L. Hawk, Walter & Haverfield, Cleveland, OH, for Plaintiffs.

G. Paul Moates, Sidley, Austin, Brown & Wood, Washington, DC, James Whitehead, Sidley, Austin, Brown & Wood, Peter J. Tarsney, Sidley, Austin, Brown & Wood, Stephen C. Carlson, Sidley, Austin, Brown & Wood, Chicago, IL, Mark D. Meeks, Anspach, Meeks & Nunn, L.L.P., Toledo, OH, for Defendant.

## ORDER

CARR, District Judge.

This is a fraud, estoppel, and breach of contract case. Plaintiffs Michael Lichoff and Robert Adams claim they were denied employment opportunities promised to them by the defendant, CSX Transportation, Inc. (CSX). This suit is brought pursuant to 28 U.S.C. § 1332(a)(1). Pending is plaintiffs' motion for class certification. For the following reasons, plaintiffs' motion shall be denied.

## BACKGROUND

Defendant CSX, a railroad company, supports training programs at several colleges located throughout the eastern United States to train employees to operate defendant's

freight trains. Plaintiffs claim that defendant engaged in a fraudulent scheme to recruit conductors to its training programs. Plaintiffs represent a putative class of individuals who attended and completed CSX-sponsored training programs and were later furloughed or unable to work the hours and earn the salaries that plaintiffs allege defendant promised during recruiting seminars.

Defendant worked with the colleges administering its training programs to develop materials for recruiting seminars. These materials, according to plaintiffs, promised job openings "at specific locations on specific dates," with "substantial salaries" in order to induce prospective students to enroll in the training programs. (Doc. 33 at 2). In addition, plaintiffs allege that defendant's recruiting materials "virtually guaranteed" placement in the promised job opening upon successful completion of the college's training program. (*Id.*)

Plaintiffs claim that defendant's promises were false, because plaintiffs were furloughed shortly after being hired and were unable to earn as much money as defendant promised.

## A. Training Program Recruiting Seminars

Plaintiffs' allegations primarily arise from information given by presenters at recruiting seminars designed to persuade potential students to enroll in the conductor training programs. Nine colleges in sixteen states presented the programs. They and the defendant developed the recruiting materials. The presenters were usually representatives of the colleges, though defendant sometimes had representatives at the seminars.

Plaintiffs allege that presenters at the recruiting seminars promised that defendant had current openings at locations throughout its system, which operates in twenty-three states, the District of Columbia, Ontario, and Quebec. Although the record contains some inconsistencies, apparently presenters represented to potential students that CSX train service employees made a base salary of

approximately $30,000 to $40,000, with the potential to earn $50,000 to $80,000 shortly thereafter. According to the plaintiffs, recruiters also told prospective trainees that individuals willing to work long hours could expect to earn upwards of $100,000.

To obtain the jobs, plaintiffs were instructed to enroll in the conductor training program. They allege they were told that only those individuals who falsified information would not receive jobs after completing the program. Plaintiffs also claim that, at the conclusion of each seminar, presenters stated that acceptance into the program confirmed an open position at a specific CSX location that would be held for the trainee. Plaintiffs allege that the various presentations at different colleges in the several states where the programs were offered essentially were uniform in content.

Defendant counters that it did not guarantee jobs for students who enrolled in the colleges' training programs, though it did work with the colleges to project its need for new employees. Defendant admits that the colleges attempted to admit a limited number of students into the training programs to match defendant's hiring needs with the number of program graduates. Prospective students were told at the recruiting seminars that they would only be admitted into the training program if CSX had a projected opening available in that student's selected area.

Defendant points out that the colleges told prospective students that they were not legally guaranteed a job. Moreover, prospective students at Clayton College & State University, the first college to offer the training program, apparently were shown and asked to sign a form that stated, among other things, "My employer will have the right to temporarily reassign or furlough me if I do not have the seniority to hold a position where I am assigned." (Doc. 78 at 10). It appears that other colleges also attempted to inform students, whether in writing or during the course of the oral recruitment presentation, that they could

potentially be furloughed or asked to relocate. It appears, however, that some colleges did more to explain this possibility than others and that individuals in attendance at the different colleges' presentations went away with unique understandings of the possibility that they could be furloughed or that the work available to them would be limited.

Despite this evidence about notice about the risk of furlough and lay-off, the named plaintiffs contend that they plaintiffs and many others were not informed about that possibility. Plaintiffs assert that the colleges' presentations were essentially uniform and that the possibility of furlough was either not mentioned at all or was heavily played down in order to convince recruits to enroll. Plaintiffs admit that prospective students were told that the college could not legally guarantee them jobs, but allege that

> [R]ecruits were consistently told that 95% to 99% of those students successfully completing the program were hired by CSX ... Any who participated in the program and were denied employment missed that opportunity not based on the subjective determination of the railroad, but because of a failure to meet criteria set by CSX
> . . . .

(Doc. 33 at 22).

## B.  The Training Programs

Each of the plaintiffs and proposed class members paid approximately $4,000 to enroll in a CSX training program at one of the colleges offering the program. Several of them claim to have foregone other employment opportunities or resigned from other jobs to complete the training. During the training program, according to the plaintiffs, they received identical written "offers of employment" confirming that each would be employed by defendant if they satisfactorily completed the program, passed several physical tests, and truthfully provided all information required in the application. Plaintiffs and proposed class members signed these offers and completed all of the training requirements.

## C.  Plaintiffs' Employment after Completing the Training Programs

Following the training program, plaintiffs and the proposed class members completed a field training course and several shifts as "conductor-trainees." Immediately or shortly thereafter, they were furloughed, sometimes without working a single shift. Both named plaintiffs endured long periods of furlough, followed by shorter periods during which they worked. The named plaintiffs allege that neither has earned the amount of money nor had the opportunity to work as many shifts as CSX and the colleges promised. Plaintiffs submit statements from other CSX train service employees confirming that many of the trainee/employees have been furloughed in the past several years.

The named plaintiffs admit that defendant offered them the opportunity to work in other cities within their CSX "seniority districts" while they were furloughed. Both allege, however, that they had been promised work at their "home" locations, and that CSX's offer to allow them to work from other locations within the seniority district did not abrogate its promise that they would be employed, with specific wages and sufficient work opportunities, at the home location they chose.

Plaintiffs claim that defendant repeatedly and knowingly presented false information and promises of employment. Plaintiffs also allege that defendant's failure to provide them with immediate regular employment was in violation of their contracts, specifically, the "offer of employment." Plaintiffs, therefore, claim fraud, estoppel, and breach of contract.

## STANDARD OF REVIEW

■■■ " 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' " *Eisen v. Carlisle & Jacquelin*, 417

U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (citation omitted). The court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This means that a class is not maintainable simply because the complaint repeats the legal requirements of Rule 23. *Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). " '[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.' " *Id.* (quoting *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364).

## DISCUSSION

To have a class certified, a plaintiff must establish that the class meets all the requirements of Fed.R.Civ.P. 23(a) and also meets the requirements of one of the three subsections of Fed.R.Civ.P. 23(b). Rule 23 states:

(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available for the fair and efficient adjudication of the controversy.

Before satisfying Rule 23 specifications, plaintiffs must clearly define the class, so that its prospective members can be reasonably identified. A court faced with an unsuitable class definition may reject the class. Alternatively, the court may "construct a definition of the class … or may modify a proposed definition where the original is inadequate." *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D.Nev.1985) (citing *Metcalf v. Edelman*, 64 F.R.D. 407 (N.D.Ill.1974); *Metropolitan Area Hous. Alliance v. H.U.D.*, 69 F.R.D. 633 (N.D.Ill. 1976)).

### A. Whether the Class Definition is Proper

Plaintiffs define the class as:

all persons who became qualified train service employees for CSX Transportation, Inc. by successfully completing a 'conductor training program' at a designated college or institution and the training and qualification procedure as set forth by CSX, from 1996 to the present, and were thereafter furloughed at their designated home terminal within the first twenty-four (24) months after marking up as regular train service employees.

(Doc. 33 at 1).

Defendant does not challenge plaintiffs' definition in this motion. Therefore, it is

sufficient to say that the definition specifies CSX employees who attended training programs at the colleges and universities designated in the pleadings and were furloughed within the first twenty four months of their employment with CSX. Because a check of defendant's employment records could confirm the employment history of each proposed class member, this definition is sufficiently definite to permit consideration of the factors presented in rule 23.

## B. Requirements of Rule 23(a)

To be certified, a proposed class must first meet all four of the requirements of Fed. R.Civ.P. 23(a). These four requirements are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of fact and law common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Defendant alleges that plaintiffs have failed to establish all of these requirements.

### 1. Numerosity

Plaintiffs' complaint must establish that the "class is so numerous that joinder of all members is impracticable ...." Fed.R.Civ.P. 23(a)(1). Courts consider both the number of prospective class members and several other factors related to the practicality of joinder, including "avoidance of a multiplicity of actions, geographic dispersement of class members, size of individual claims, financial resources of class members, and the ability of claimants to institute individual suits ...." 1 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 3:6, at 251 (4th ed.2002).

Plaintiffs must present more than speculation, but plaintiffs do not have to "establish class size with precision." *Sims v.*

*Parke Davis & Co.,* 334 F.Supp. 774, 781 (E.D.Mich.1971). In the case at bar, plaintiffs note that defendant's Assistant General Manager of Crew Management stated that CSX furloughed approximately 800 conductors in 2002, around 500 in 2001, and had already furloughed 212 by February, 2003. (Doc. 33, at 28). Plaintiffs do not specify, however, how many of these furloughed employees were furloughed during their first twenty four months of employment.

It is not, as defendant argues, important to this numerosity analysis whether plaintiffs have shown that any of their proposed class members were aware of the possibility of post-hire furloughs. Plaintiffs' proposed class includes all employees who completed training programs, became employees of CSX, and were denied continuous full-time employment sometime during their first twenty four months of employment. The class definition does not mention knowledge of the possibility of furloughs.

Plaintiffs have shown that there are at least 1500 CSX employees who were furloughed. It is undisputed that CSX employees are stationed in locations throughout the eastern United States, making joinder impracticable. Both plaintiffs' and defendant's pleadings indicate that new conductors (i.e., conductors with less seniority) were more likely to be furloughed than conductors with more seniority. Plaintiffs have met their burden with regard to numerosity and have shown that their proposed class will be sufficiently numerous and joinder would be sufficiently impracticable to satisfy rule 23(a)(1).

### 2. Commonality

Plaintiffs' efforts to broaden its class definition to satisfy the requirements of a proper class definition and sufficient class numerosity, however, make it difficult for plaintiffs to establish questions of fact and law common to plaintiffs' proposed class members.

The commonality requirement does not require that all class members share

identical claims and facts. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988). Rather, "'there need be only a single issue common to all members of the class.'" *Am. Med. Sys., Inc.*, 75 F.3d at 1080 (*quoting* 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3:10, at 3–50 (3d ed.1992)). The single common issue, however, may not be just any issue. It must be "a common issue the resolution of which will advance the litigation." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998). The Rule 23(a)(2) requirement is linked to the requirement in Rule 23(b)(3), which plaintiffs allege applies here, and which requires plaintiffs to show not only that there are common issues of fact and law, but also that the common issues predominate over the individual ones. Plaintiffs have failed to establish sufficient facts to show that either requirement has been met.

Plaintiffs claim that "[t]he fact that Defendant engaged in a common course of conduct that resulted in damage to each class member establishes that common issues of law or fact exist." (Doc. 33 at 32). Plaintiffs rely on *Davis v. Avco Corp.*, 371 F.Supp. 782 (N.D.Ohio 1974) for the proposition that "where ... the complaint alleges a course of conduct in which similar oral misrepresentations were made to all the members of the class, the requirement of common questions of law or fact have been met." *Id.* at 790.

Plaintiffs argue that each CSX employee who attended the training program recruiting seminars was induced to sign up for the training program because he or she relied on promises during the presentation that CSX has guaranteed a job for each program graduate that would pay at least $30,000–$40,000 per year. Plaintiffs' argument relies on the factual assumption that each recruiting seminar presented the same information regarding employment opportunities, salaries, and the possibility of furloughs. This is because to maintain their claims of fraud, breach of contract, and estoppel, plaintiffs will have to show that defendant uniformly controlled the content of the representations made to recruits at the seminars and intended to induce reliance on those representations. In addition, plaintiffs will have to establish that class members relied on the uniform representations.

In *Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2nd Cir.2002), the Second Circuit held:

> liability for fraudulent misrepresentations cannot be established simply by proof of a central, coordinated scheme.... each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss.... Fraud actions must therefore be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification .... Where there are material variations in the nature of the misrepresentations made to each member of the proposed class, however, class certification is improper ....

*Id.* at 1253.

Contrary to plaintiffs' assertions, the record reveals numerous inconsistencies with regard to what prospective CSX employees remembered being told at the recruiting. Some said they were told they could earn $30,000 to $40,000 in the first year of employment, others did not recall being told an exact figure. Some remembered the presenters at their recruiting sessions telling them they could earn $100,000 per year as a conductor, others remembered being told that pay topped out at around $60,000 to $70,000. Some remembered being told that the railroad business was booming, and there were enough jobs for everyone, others could not remember any mention of a possibility of furloughs or lay-offs. Some admitted that, even if the possibility of furloughs was not mentioned, they understood that furloughs were possible based on previous experiences. Additionally, defendant alleges that each recruit was asked during an interview in the third week of the training program whether

s/he understood that he or she could be furloughed or required to move to hold a job with defendant.

It is not clear from these examples that CSX controlled the content of the recruiting seminars or uniformly required the colleges to present specific information to induce recruits to enroll in the training program. A more individualized ' examination of each plaintiff's experience would be required for plaintiffs to maintain their fraud, breach of contract, and estoppel claims. This is especially true in light of the fact that plaintiffs' class definition includes all CSX employees who completed a training program at a designated college, fulfilled CSX's training procedures, and were thereafter furloughed. Surely, in light of the disparities in statements from the deposed employees, many among this broad class of individuals had unique experiences at the hundreds of recruiting seminars. Plaintiffs, at any rate, have not satisfactorily shown otherwise.

The record also reveals inconsistencies in what information recruiting seminar presenters conveyed to prospective students about job prospects, salaries, and the likelihood that new employees would be able to work enough shifts to earn maximum salaries. In addition, it seems clear that the colleges used different materials and strategies to present the material. Some colleges used Power-Point presentations prepared in conjunction with other colleges that were directing the training program, others developed their own presentations based on the materials received from other colleges and from defendant. Some had students sign a statement verifying that they knew that they were not guaranteed a job, others did not. Most told students of their high placement rates, but those rates varied from school to school. Again, it appears that individualized determinations of what each college's representative told recruits would be required to determine the merits of plaintiffs' claims.

The Sixth Circuit's holding in *Sprague,* 133 F.3d at 397–98 is instructive on this issue. The court in *Sprague* held that the district court wrongly certified a class of former employees who claimed that General Motors had made oral promises to pay lifetime health insurance because GM's statements to the early retirees were not uniform in content or in the style of their presentation. *Id.*

In *Sprague,* it appeared that early retirees were treated differently than later retirees, though plaintiffs wanted to represent both early and later retirees in their class action. Similarly, in the instant case, there are material variations in the representations made to prospective class members at the recruiting seminars.

Plaintiffs have not shown that common issues, the resolution of which would advance litigation, are present here. There is no clear indication in the record that training program recruits were told the same things, much less made the same promises, regarding employment.

▮ Additionally, defendants allege that the necessity of applying the laws of multiple states in the instant case makes it more clear that common issues do not predominate over the individual issues at stake for each proposed class member. Variations in state law, when the laws of multiple states are potentially applicable to a case, may severely decrease the practicality of trying the claims as a class action. *See, e.g., Am. Med. Sys., Inc.,* 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ [in a nationwide class action], the district judge would face an impossible task of instructing a jury on the relevant law ...."). Plaintiffs, however, allege that the laws of only six states would apply in this case—those states in which the proposed class members attended their training programs. Defendants counter that the laws of sixteen states will apply—those states in which the recruiting seminars were held. The more state laws involved, the less appropriate class certification tends to become.

▮ Ohio law on choice-of-law rules governs this dispute. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85

L.Ed. 1477 (1941); *Cole v. Mileti,* 133 F.3d 433, 437 (6th Cir.1998). In Ohio, the *Restatement (Second) of Conflict of Laws* governs conflicts issues. *Cole,* 133 F.3d at 437. For a contract dispute, the Restatement directs that the law of the state with the most significant relationship to the transaction and the parties be applied. *Ohayon v. Safeco Ins. Co.,* 91 Ohio St.3d 474, 477, 747 N.E.2d 206 (2001). The factors to be considered in making this determination are: "the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.*

In a tort dispute, the law of the state in which the place of injury occurred usually controls, unless another state has a more significant relationship with the case. *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984). The factors to be considered in determining whether another state has a more significant relationship include:

> (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 ... [of the Restatement] which the court may deem relevant to the litigation.[1]

*Id.*

Plaintiffs' claims for fraud and estoppel arise primarily from representations made to recruits at the recruiting seminars, which took place in at least sixteen different states.[2] The Restatement directs that the law of the place of injury should control unless circumstances indicate that another state has a more significant relationship to the claims. Plaintiffs argue that the harm actually occurred only in the six states where the proposed class members enrolled in and attended the training programs.

Plaintiffs' motion, however, attempts to establish that the statements made to recruits at the recruiting seminars were the primary source of injury and were uniform for each college that conducted the training program in association with defendant. It seems clear that the reliance induced by the allegedly fraudulent misrepresentations was established at the location of the recruiting seminar, where students filled out applications forms if they were interested in entering a training program.

The substance of plaintiffs' fraud and estoppel claims thus arose in the sixteen states where the recruiting seminars took place. Not only are these states the places of injury, they are also the places where the conduct causing the injury occurred (i.e., where the alleged misrepresentations were made). These factors are the overriding factors for consideration in fraud and misrepresentation cases. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 (1988) (noting that the place where the defendant made the false representations is as important as the place of injury, and further noting that when a major part of the representations are made

---

**1.** Section 6 provides as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1988).

**2.** Defendants lists those states as Delaware, Florida, Georgia, Indiana, Kentucky, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Pennsylvania, Ohio, Tennessee, Virginia, and West Virginia. (Doc. 78, at 41).

in one state and a lesser part in another, the first state has the more important contact).

Plaintiffs' breach of contract claim arises primarily from an "offer of employment" letter that plaintiffs allege was sent to each individual admitted to a conductor training program at one of the colleges. These letters were allegedly sent to proposed class members' homes or domiciles during the training program, where they signed the letter and returned it to defendant. The place of negotiation seems to have been both the location of the recruiting seminar, where plaintiffs' allege defendant induced proposed class members to enroll in the training program, and the location of the training program, where recruits completed conditions precedent to fulfillment of the alleged contract. Therefore, the place of performance is also the location of each proposed class member's training program. Based on this information, the contracts would be governed by the law of the state in which they were signed and largely performed—the states in which the training programs were located. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAW § 188 (1988) (noting that the place of negotiation and place of performance are the most important considerations, though the place of negotiation becomes less determinative if negotiation occurs in more than one state).

On balance, the choice-of-laws issues indicate that the application of different state laws to separate claims make this a moderately complex class action to manage adequately on behalf of all class members. These issues are not dispositive of the issue of commonality, though, since it is not clear from the facts that each proposed class member experienced the same representations regarding employment or entered into the same contract for employment. What each recruit believed to be true about defendant's employment offer is a material fact that is individual to each proposed class member.

It is sufficient to say, however, that the laws of six states would apply to the breach of contract claim. This would make it bur-

densome to instruct a jury on the legal standards for plaintiffs' claims. Although it is true, as plaintiffs point out, that courts have granted class certification on nation-wide cases involving the laws of all fifty states, the lack of common issues in this case, combined with the prospect of working with and applying the law of at least sixteen states for one claim, and six of those states for the other, make the case inappropriate for class certification.

In light of the foregoing, plaintiffs have failed to establish the necessary factual basis for satisfaction of Rule 23(a)(2). They have also failed to show that any common issues predominate over individual ones. Therefore, even if plaintiffs had established some common issue of fact or law for the purposes of Rule 23(a)(2), certification is inappropriate under Rule 23(b)(3).

### 3. Typicality

Rule 23(a)(3) requires that the named plaintiffs' claims and defenses be typical of the class. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Sprague*, 133 F.3d at 399 (*quoting Am. Med. Sys., Inc.*, 75 F.3d at 1082). Moreover, "a necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiffs will also advance the interests of class members." *Id.*

Plaintiffs argue that "[t]he typicality requirements has been met ... [where] the proposed class representatives were exposed to a course of conduct common to the class." (Doc. 33 at 34). It is true that the existence of some factual differences between named plaintiffs' cases and other class members' cases does not, by itself, defeat typicality. My holding on the Rule 23(a)(2) commonality issue, however, bears on the viability of plaintiffs' argument here. As I explained above, plaintiffs have not established that any issues of fact or law are sufficiently common among proposed class members.

Plaintiffs assert that "[e]ach cause of action outlined in Plaintiffs' Complaint is available to every proposed class member." (Doc. 33 at 33). Plaintiffs' failure to establish the existence of common issues of fact and law, however, refutes this assertion. It is not clear that every proposed class member had the same (not just a similar) experience, nor has it been established that defendant required the colleges to present uniform information to all recruits.

Therefore, I cannot say that the claims of plaintiffs Lichoff and Adams are typical of those of the proposed class.

#### 4. Adequacy

■ Rule 23(a)(4) requires that the representative parties fairly and adequately represent the class. "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." *Am. Med. Sys., Inc.,* 75 F.3d at 1083 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). Of course, in light of the court's holding regarding commonality and typicality, it is obvious that the named plaintiffs cannot adequately represent a proposed class that does not share common issues and for which their claims are not typical.

> Permitting a representative to maintain a class action that will bind absent class members whether the result is favorable or adverse requires that the adjudication of plaintiff's claims involve an adjudication of issues common to the class of which the plaintiff's claims are typical. If the plaintiff's claims are not typical, then ... plaintiff cannot adequately represent that class.

1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 3:22 at 411 (citations omitted).

■ The Sixth Circuit has articulated two criteria for determining the adequacy of representation: " '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.' " *Am. Med. Sys., Inc.,* 75 F.3d at 1083 (quoting *Senter v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir.1976)).

■ Unlike the other requirements of Rules 23(a), defendant has the burden of showing that representation is inadequate under Rule 23(a)(4). *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982) (citation omitted). In the instant case, defendant has not asserted that plaintiffs' counsel is inadequate, and there is no other reason to distrust the adequacy of plaintiffs' counsel, so the second of the *Senter* criteria is met.

As to the first *Senter* criterium, defendant claims that named plaintiffs Lichoff and Adams have several conflicts of interest with their proposed class members. Defendant asserts, for example, that Lichoff and Adams "have no personal knowledge of any of the facts and circumstances that occurred at recruiting sessions they did not attend." (Doc. 78 at 47). Defendant also asserts that "conductors who decided to work in other locations within or without their seniority districts cannot fairly be represented by Adams and Lichoff, who declined to relocate and indeed turned down work on many occasions." (Doc. 78 at 47).

Defendants' arguments are moot because it is clear that Adams' and Lichoff's claims are not typical of the class, as is required by Rule 23(a)(3), nor have they shown that the proposed class shares common issues of fact or law sufficient to satisfy Rule 23(a)(2). Therefore, Adams and Lichoff cannot adequately represent a proposed class that has not been properly established under the requirements of Rule 23(a).

#### C. Requirements of Rule 23(b)

In addition to establishing each requirement under Rule 23(a), plaintiffs must satisfy the conditions of one of the Rule 23(b) subsections. Because plaintiffs have failed to establish all of the requirements of Rule 23(a), an analysis of whether they satisfy any of the 23(b) subsections is unnecessary. I nonetheless will briefly analyze each.

#### 1. Rule 23(b)(1)

Rule 23(b)(1) provides for certification of a proposed class if

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Plaintiffs argue that certification is appropriate under Rule 23(b)(1) because "numerous individual actions seeking similar compensatory and injunctive relief most likely would be filed throughout the eastern United States in multiple federal and state jurisdictions," (Doc. 33 at 38), so that Rule 23(b)(1)(A) applies. Plaintiffs allege that certification is required "to avoid the possibility that different courts would tailor different and incompatible orders regarding Defendant's conduct, and triers of fact in multiple jurisdictions may return verdicts that are inconsistent . . . ." (Id.)

■ However, "[t]he fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)." Bendectin Prod. Liab. Litig., 749 F.2d 300, 305 (6th Cir.1984). In the instant case, the risk of establishing inconsistent standards of conduct for defendant is low because the experiences of the proposed class members were different depending on what recruiting seminar each attended. See Section B.2, supra. The resolutions of individual claims brought against defendant, therefore, will be different based on the distinct experiences of plaintiffs' proposed class members. This does not establish inconsistent standards of conduct for defendant, it merely does what multiple fraud claims against the same defendant are supposed to do: require the defendant to address each instance of alleged fraud individually and thoroughly. Moreover, there is nothing stopping plaintiffs with claims arising from the same experiences from joining together to file their claims against defendant. Therefore, certification is inappropriate under Rule 23(b)(1).

## 2. Rule 23(b)(2)

■ Rule 23(b)(2) allows certification of the class when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief . . . ." This subsection sets forth two requirements: 1) "the party opposing the class must have acted or refused to act or failed to perform a legal duty, on grounds generally applicable to all class members" 2 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 4:11, at 55 (4th ed.2002); and 2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate." Id. at 56 (internal quotation omitted).

Plaintiffs allege that certification under Rule 23(b)(2) is appropriate because "[t]he conduct of Defendant giving rise to Plaintiff's legal claims has equally affected all members of the class, and consistently affects those applicants who will participate in the conductor training program in the future." (Doc. 33, at 39). However, plaintiffs have not established that all of plaintiffs' proposed class members have been affected equally by defendant's alleged conduct. Instead, it seems clear, given my rulings on the commonality and typicality requirements of Rule 23(a), that many of plaintiffs' proposed class members may have been affected differently by representations made to them at recruiting seminars held in sixteen different states.

Additionally, defendant points out correctly that plaintiffs' proposed class definition includes only persons who completed one of the conductor training programs, were hired by defendant, and were thereafter furloughed or unable to work full-time. Plain-

tiffs' request for injunctive relief, to prevent future injury to potential employees, is not a remedy for its proposed class members. The members of plaintiffs' proposed class have, by definition, already attended a recruiting seminar and completed a training program. Because of these facts and because injunctive relief is "to be used sparingly, and only in a clear and plain case," injunctive relief is not appropriate in the instant case. *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Plaintiffs would certainly be entitled to seek monetary damages to compensate them for their loss, but may not assert standing to seek injunctive relief for prospective employees, who they do not purport to represent by their class definition.

Therefore, because injunctive relief is inappropriate in the instant case, certification under Rule 23(b)(2) is also inappropriate.

### 3. Rule 23(b)(3)

Rule 23(b)(3) allows class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Because I have found that plaintiffs have not established sufficient common issues of fact or law among the proposed class members to satisfy the requirements of Rule 23(a)(2), the issue of predominance of common questions is moot. *See* Section B.2, *supra; see also* 2 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 4:22.

Moreover, it is not clear that class action is a superior method for resolving any potential claims proposed class members may seek to bring against defendant. Certifying the proposed class in this case has the potential to harm putative class members whose cases are not typical of the named plaintiffs'. If plaintiffs lose in the class action, proposed class members who suffered damages and were not compensated under the class action would be precluded from bringing their own cases individually. *See, e.g., Cahill v. Jewell,*

No. 98–5479, 1999 WL 357747, 1999 U.S.App. LEXIS 9268 (6th Cir. May 12, 1999) (class members are barred from pursuing their individual claims once resolution is reached in the class action) (citing *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982)). Given the diversity of recollections regarding the representations made to recruits at the seminars, this would be a potentially harmful outcome for many proposed class members.

Therefore, certification is inappropriate under Rule 23(b)(3).

### CONCLUSION

In light of the foregoing, it is

### ORDERED THAT

Plaintiffs' motion for class certification be, and hereby is, denied. A telephone scheduling conference is set for November 14, 2003 at 8:30 a.m.

So ordered.